FILED

2016 Jun-01  PM 02:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| **TARA HENDERSON,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | |
| ] | **Case No.: 13-cv-1166-KOB** |
| **MID-SOUTH ELECTRONICS, INC.,** ] | |
| ] | |
| **Defendant.** ] | |
| ] | |
| ] | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Tara Henderson filed this action against Defendant Mid-South Electronics ("MSE") in June 2013, alleging race discrimination; gender discrimination; wage discrimination; violation of the Equal Pay Act; Title VII and § 1981 retaliation; and FMLA interference and retaliation. (Doc. 1). MSE moved for summary judgment on each of these claims, and the court granted summary judgment in favor of MSE on Henderson's wage discrimination and Equal Pay Act claims. (Docs. 23 & 35). The court denied summary judgment on Henderson's race discrimination, gender discrimination, retaliation, FMLA interference and FMLA retaliation claims. (Doc. 35).

The court conducted a bench trial on Henderson's remaining claims on December 15-17, 2015, in which it found in favor of Henderson on her FMLA interference and race discrimination claims, and in favor of MSE on Henderson's gender discrimination, and Title VII and § 1981 retaliation claims.[1] In this Opinion, the court summarizes its findings and sets out the damages to

---

[1] Henderson abandoned her FMLA retaliation claim at trial.

which Henderson is entitled.

I.      **Facts**

Tara Henderson is an African-American female. She was employed by Mid-South Electronics for twenty years – from January 20, 1992 until she was terminated on September 14, 2012. Henderson began working at MSE as an operator, but was later promoted to a supervisor position.

A.      Health-Related Leave and Absences

Henderson requested and was granted FMLA leave on four occasions during her employment with MSE – in 1998 in relation to an intrauterine pregnancy, in 2002 for maternity leave, in 2005 for foot surgery, and in 2010 for a hysterectomy.

Henderson was absent from work for medical reasons on various other occasions. In 2011, Henderson began having chronic joint pain, joint swelling, and fibromyalgia, which sometimes caused her to miss work. In December 2011, Henderson spent three days in Gadsden Regional Hospital, where she was diagnosed with biliary dyskinesia and possible neuromuscular disease. Henderson gave MSE a doctor's note excusing her from work from December 19 to December 28, 2011.

Following this hospitalization, on January 3, 2012, Mark Weaver, the Director of Training and Development at Mid-South Industries, Inc. (a parent corporation of MSE), and Jean Lawson, who handled personnel responsibilities for MSE, met with Henderson to discuss her absenteeism.

A memo in Henderson's file about this meeting states: "Discussion began with Mark Weaver asking Tara about her most recent health related absences. Tara explained that she was

2

feeling better but was awaiting lab results. She said there had not been a specific diagnosis and doctors were unsure of what was wrong with her." (Pl.'s Ex. 2, at 26). This memorandum also states that, in addition to Henderson's 15 allocated days of vacation and 5 holidays, Henderson had missed 22 full days of work in 2011. Jean Lawson, however, admitted at trial that, at the time of this meeting, she was not aware that Henderson had been hospitalized in 2011, and that the absences in question included the times when Henderson was out for health-related reasons.

This memorandum also indicated that if Henderson needed to be absent from work, she should "call George Robertson, Joe McKinley, & the HR office in that order each day of absence." (Pl.'s Ex. 2, at 26). Henderson testified that she was not given this instruction at the meeting and that she was not given a copy of the memo.

B.    Alleged Racial Comments

Henderson alleges that during her employment with MSE, her supervisor, George Robertson, made racially discriminatory comments to her. Robertson admitted that he told Henderson that if she promoted an African-American, "it's going to look like favoritism because you're promoting a black person and you're black." (Proposed Facts, Doc. 53 (citing Robertson Depo. 93:1-96:4); Trial Tr. 12/16/15). Robertson testified that he made this statement because Henderson was not following the proper procedures for posting a job opening, and he was trying to explain to Henderson why she needed to post the job before making the decision to promote an employee. Henderson, on the other hand, testified that the procedures were not in question when Robertson made this statement.

Henderson testified that she reported Robertson's alleged discriminatory statements to Jean Lawson and Mark Weaver in May or June 2012 and again in August 2012. Henderson

3

asserted that she told Lawson and Weaver that she thought Robertson's statement reflected gender and race discrimination. Henderson also complained that she felt like the male supervisors made more money than she did and that Robertson was excluding her from emails and meetings, and wasn't talking to her or treating her like she was a supervisor. Jean Lawson admitted that Henderson told her that she was being left out of production meetings, but Jean Lawson and Mark Weaver both denied that Henderson ever complained to them about race or gender discrimination.

William Taylor Cash, a molding set-up technician at MSE who reported to Henderson when she was his molding supervisor, testified that he heard George Robertson use racial slurs such as "porch monkey," "jigaboo," and "bluegum" on numerous occasions. Cash described specific instances in which he remembered Robertson using these slurs. For example, Cash testified that when Robertson heard a black MSE employee named Patrick Morgan yelling, Robertson said "it sounded like a bunch of porch monkeys." (Trial Tr. 12/15/15). Cash said that he did not report Robertson's comments to Human Resources because he was afraid that he would lose his job.

At trial, Robertson denied ever using these slurs. Robertson admitted that he had used the word "nigger" before, but claimed that he had not used it in relation to MSE employees. When asked about Patrick Morgan, the MSE employee Robertson had allegedly called a "porch monkey," Robertson testified that he had a positive relationship with Patrick and liked him so much that he referred to him as JJ because he thought he looked like JJ from the television show "Good Times."

Henderson testified that after she complained of discrimination, William Taylor Cash told

4

her that Robertson had been watching her and had been asking Cash what time Henderson came to work or went to lunch. (Trial Tr. 12/16/15; *see also* Proposed Facts, Doc. 53 (citing Cash Declaration ¶ 2)). Henderson testified that after hearing from Cash, she called Robertson and confronted him about what Cash had told her. Henderson asserted that Robertson said in response, "I'm going to get on to Taylor because he shouldn't have told you that." (Trial Tr. 12/16/15; Proposed Facts, Doc. 53 (citing Henderson Depo. 145:21-146:6)).

Cash testified that Robertson asked him about Henderson's whereabouts a few times a week, every week, towards the end of Henderson's employment. Cash stated that Robertson would ask him things such as if he knew what time Henderson went to lunch or what time she got back. Cash further testified that Robertson sometimes would ask where Henderson was, and after Cash told him, Robertson would walk in the opposite direction.

Robertson denied telling Cash to monitor Henderson, but remembered one time when MSE was having an issue in molding and he asked Cash to have Henderson call him as soon as he saw her.

Tonia Thomas, another employee who worked at MSE with Tara Henderson, testified that she observed instances in which Joseph McKinley, the Vice President of MSE, would avoid speaking directly to Henderson. Thomas testified that "[h]e could be standing right there and George would be next to him and then Tara would be on the other side and he would tell George to tell Tara to do something." (Trial Tr. 12/15/15).

C.    Henderson's Transfer and Termination

In June 2012, George Robertson made the decision to transfer Henderson from Molding Supervisor to Production Supervisor. In a June 27, 2012 meeting, Robertson, Weaver, and

5

Lawson informed Henderson that effective July 9, 2012, she would be moving to Assembly as a Production Supervisor. Henderson's new position would still be a supervisor job, and Henderson's pay would not be decreased. As a Molding Supervisor, Henderson worked twelve hour shifts. In her new position, Henderson would be required to work eight hour shifts. At this meeting, Henderson "expressed concerns about her doctor's appointments" because "[s]he scheduled doctor appointments around 12-hour shifts." (Proposed Facts, Doc. 53 (citing Weaver Depo. 103:23-104:10; Pl.'s Ex. 2, at 29)). Lawson and Weaver testified that Henderson would still be able to leave for doctor's appointments as long as she let her supervisor know. All MSE employees eventually transitioned to eight hour shifts.

A memo typed by Jean Lawson following this meeting states that Henderson had made a "[v]ast improvement on absences-only 1 absence to date-22 in 2011." (Proposed Facts, Doc. 53 (citing Pl.'s Ex. 2, at 29)). The memo also states: "Absences should be reported to George, Joe, Mark or call the Reporting off work number." (*Id.*). The memo did not indicate that Henderson needed to call in every day she would be out if she was going to be absent for multiple days in a row. Henderson was not given a copy of this memo.

Henderson began seeing her health care provider again in June and July 2012 for treatment of her ongoing health problems. Henderson's Nurse Practitioner Sammye Bradley testified that when she evaluated her in June, Henderson was suffering from edema, or swelling, of the lower body and hands, which was painful and would lead to increased edema after long periods of sitting or standing. Bradley also testified that Henderson had continued neck pain, lower back pain, high blood pressure, trouble sleeping, generalized fatigue, and weight gain, as well as the temporary condition of shingles. Additionally, Bradley stated that Henderson's lab

results from these visits indicated possible rheumatoid arthritis. Bradley referred Henderson to a rheumatologist, Dr. Chindalore, for further evaluation of her rheumatoid symptoms.

Henderson was absent from work on July 10, 2012, but gave MSE a note from Dr. Just, her pain management doctor, which excused her from work on that day.

On Thursday, September 6, 2012, Henderson took a vacation day, which was approved by her supervisor George Robertson. Henderson testified that on Friday, September 7, 2012, she called Robertson to report that she needed to take off work to go to the doctor, but Robertson did not answer, so she left a message.

Henderson saw Nurse Practitioner Sammye Bradley on this same day, complaining of continued body aches, swelling, and fatigue. Bradley testified that Henderson had not shown any improvement since her June and July visits. Bradley prescribed a course of treatment for Henderson's temporary condition of a urinary tract infection, prescribed Henderson with new medications to ease her swelling and discomfort, and advised Henderson to take a leave of absence from work until she could identify the cause of her symptoms. (12/17/15 Trial Tr.; Pl.'s Ex. 31, at 1425 ("advised LOA [leave of absence] until full evaluation")). Bradley testified that she recommended that Henderson take a leave of absence because she was unable to perform her daily activities. Bradley gave Henderson a note at this visit excusing her from work from Friday, September 7 until Sunday, September 9, 2012. Lab tests later confirmed that Henderson was also suffering from the temporary conditions of shingles and mononucleosis at this time.

Henderson called Lawson at 2:51 PM on September 7 to explain that she would be out of work and to ask Lawson what she needed to do to take a leave of absence. (*See* Lawson's notes regarding this phone call, Pl.'s Ex. 2, at 33). Lawson asked Henderson how long she would be

out, and Henderson said that she would not know until she saw the doctor. Lawson claims that she told Henderson to "have the doctor write something out on his letterhead stating that she was unable to work from what day to what day." (Proposed Facts, Doc. 53 (citing Lawson Depo. 17:20-22)).

Lawson admitted at trial that she knew Henderson was asking to take leave for medical reasons. Lawson also acknowledged that Henderson's request for medical leave may have been an FMLA qualifying event. Mark Weaver similarly admitted that an employee notifying human resources that her doctor had taken her out of work would provide sufficient notice of potential FMLA leave.

Henderson testified that she next called and spoke to George Robertson on Monday, September 10. Henderson asserted that she called Robertson to make sure that he had gotten the message from Lawson that she was going to be out for medical reasons, and to let him know that she was going to have some lab work done that week. Henderson testified that she did not give Robertson any date when she expected to be back at work or when he should expect to hear back from her. Henderson further asserted that she told Robertson not to stab her in the back, and that Robertson responded that he didn't need to because Mark Weaver and Joseph McKinley were already waiting in line to do that. (Trial Tr. 12/16/15; Proposed Facts, Doc. 53 (citing Henderson Depo. 115:7-15)).

MSE disputed this timeline of events, and the testimony offered at trial regarding when Henderson called George Robertson and when Henderson said she was returning to the doctor was inconsistent. Lawson's notes indicate that Henderson called Robertson at 4:55 AM on Friday, September 7, but did not leave a message. These notes also state: "Friday talked to

8

George – told him she was going to doctor on Wednesday." (Pl.'s Ex. 2, at 33). At trial, Lawson was unsure whether she prepared these notes on September 7 or September 14 and was also unsure whether Henderson called Robertson on Friday or Monday or both. Robertson was similarly confused about the timeline of events. He testified at trial that when Henderson called him on Thursday, September 6 to request a vacation day, she told him then that she was going to the doctor the following Wednesday. Robertson also asserted that, contrary to Lawson's notes, Henderson did not call him on Friday morning and did not leave him a message that morning. Further, Robertson's testimony at trial conflicted with his deposition testimony, in which he said Henderson did not tell him that she was going to the doctor on Wednesday at all and that he had learned this information from Lawson.

On Thursday, September 13, at 8:07 AM, Robertson emailed Mark Weaver to report that he had not heard back from Henderson. Weaver forwarded Robertson's email to Lawson, and Lawson replied that she also had not heard anything from Henderson. (*See* Pl.'s Ex. 2, at 33).

On the afternoon of Friday, September 14, Henderson called MSE to ask about picking up her paycheck, and Lawson told Henderson that she needed to come in to meet with her. Lawson did not tell Henderson that she would be terminated or ask her to bring a doctor's note to work with her. Henderson came in to work and was terminated by Lawson, with Carol Gilliland present as a witness and notetaker. Lawson did not make the decision to fire Henderson; George Robertson and Mark Weaver were responsible for the decision to terminate Henderson, with Robertson having the primary decision-making authority, and Weaver thereafter approving Robertson's decision.

At the September 14 meeting, Lawson did not ask Henderson for a doctor's note.

9

Henderson testified that she did not bring a doctor's note because Lawson told her to bring a note when she returned to work after her medical absence, and Henderson was not returning to work, but was just coming to pick up a paycheck. No one from MSE tried to contact Henderson between her request for leave and the September 14 meeting.

Henderson's termination report states that she was terminated for "[e]xcessive absenteeism, failure to call in, failure to follow instructions after repeated counseling rendering associate of little use to the company." (Proposed Facts, Doc. 53 (citing Pl.'s Ex. 2, at 23)). Henderson's termination form was signed by Lawson and Joseph McKinley. The form was also initialed by Mark Weaver and signed "Approved" by George Robertson.

Henderson did not give a doctor's note to MSE at any time following the September 14 meeting. Henderson testified that she did not provide a note for her September absences because MSE never asked for one, and she was terminated before she had the opportunity to do so. Henderson received a doctor's note from Sammye Bradley on September 17, 2012, which excused her from work from September 10 to September 24, 2012.

Jean Lawson and Mark Weaver admitted at trial that they knew that under the FMLA, if an employer requests certification of an employee's need for leave, the employee has fifteen days from the date of the request for certification to provide her employer with the necessary documentation.  MSE neither requested certification from Henderson, nor did it give Henderson fifteen days to provide the necessary documentation. MSE also did not provide Henderson with a written notice of potential FMLA eligibility within five days of her request for leave, as required by the FMLA.

D.    MSE's Policies

At trial, the witnesses presented conflicting accounts regarding the proper call-in procedures for an employee who needs to miss work for medical reasons. Henderson testified that MSE did not have any particular steps that an employee was required to follow to obtain medical leave. Henderson stated that the procedure for calling out from work was to contact her supervisor, or to contact HR if the supervisor was unavailable. Henderson also stated that employees who were going to be out for more than one day for medical reasons did not have to call in every morning.

MSE disagreed with Henderson's characterization of its policies and said that Henderson was required to call in to report any absence. Jean Lawson testified that supervisory employees should call their immediate supervisor prior to the beginning of each shift to report their absences, and then call Joseph McKinley, Mark Weaver, or the automated reporting off work number if their immediate supervisor was unavailable; however, Lawson admitted that MSE had no written policy for supervisory employees to follow when seeking medical leave. Joseph McKinley similarly testified that employees were expected to call in for work every day they were not going to be there. However, Mark Weaver admitted that on prior occasions when Henderson was out for medical leave, Henderson was not required to call in everyday, but could just bring a doctor's note that covered the entire time period.

At trial, witnesses for MSE repeatedly testified that MSE had an attendance policy that applied to supervisory employees; however, the MSE witnesses could point to no evidence of this alleged attendance policy. When questioned about the policy, Lawson admitted that MSE's only written attendance policy was for hourly employees, not salaried employees, such as

11

Henderson. (Trial Tr. 12/15/15; *see also* Pl.'s Ex. 11).

MSE's only method of tracking attendance for supervisory employees was through the records kept in the guard buildings. Lawson testified that a supervisory employee, like Henderson, "would generally come through the main gate and the switch board operator who was stationed at the guard building would sign her in, check her in as being present." (Trial Tr. 12/15/15). The operators noted in a spreadsheet when supervisors were present or absent, and MSE used the guard shack records to create attendance calendars for each employee, with notations such as A for an absence, V for vacation, or L/E for leave early. The evidence presented at trial, however, demonstrated that these calendars were unreliable methods of record-keeping. Operators were not present at the guard building 24 hours a day, so sometimes a guard would not be present when Henderson arrived. MSE also had no method of noting on the calendars when Henderson left work early or was absent for medical reasons. All absences other than approved vacation days were simply recorded with an A or an LE. Jean Lawson acknowledged that some of the LEs on Henderson's calendar could be for legitimate reasons. Mark Weaver similarly admitted that in looking at Henderson's attendance calendar, you could not tell whether Henderson had doctors' excuses for her absences.

MSE has a salary continuation policy that allows employees who are out on medical leave to continue to receive their salary for 13 weeks. Henderson would have been eligible to receive this salary continuation had her medical leave been granted. When Henderson was terminated, she also had five days of vacation that she had not yet used and for which she was not paid.

    E.    <u>Henderson's Post-Termination Efforts</u>

Henderson has not worked since her termination from MSE. Henderson testified that she

looked for work weekly by applying to jobs online, over the phone, and in person. Henderson stated that she applied for jobs at Winn-Dixie, McDonald's, Doctor's Care, and possibly Popeye's, but was unable to find comparable employment. Henderson did not apply for any jobs in a manufacturing setting similar to MSE. Henderson also limited her search to jobs in a supervisor position that allowed her to sit down.

Henderson applied for Social Security Disability in November 2013, but was denied eligibility. Henderson concedes that she was not able to work as of November 1, 2013. At trial, Nurse Practitioner Sammye Bradley testified that in her opinion, because of her ongoing illnesses, Henderson would not have been able to return to work in September 2012, or at any time thereafter. (12/15/15 Trial Tr. (When questioned about when she thought Henderson "might be able to go back at the level she had been doing prior to being out in September," Bradley answered, "I don't believe she will ever be able to.")). Bradley further testified that if Henderson returned to work at any time after September 2012, she would be doing so against her medical advice. Henderson testified that she nevertheless would have continued going to work, against the advice of Nurse Practitioner Bradley, if she had not been fired, and that MSE could have accommodated her condition by allowing her to sit down sometimes.

Bradley's evaluations of Henderson following her termination indicated that Henderson continued to suffer from the same debilitating conditions post-termination. Henderson's medical records indicate that as of May 13, 2013, her condition had not improved, and that Henderson continued to complain of "joints still hurting, body hurting all over, unable to stand any length of time, fatigue, generally feels bad." (Pl.'s Ex. 31, at 1420).

Henderson testified that her termination had a significant impact on her personal life.

13

Henderson asserted that as a result of being out of work she was behind on bills, was not able to buy clothes, and could not afford family trips. Henderson recounted one particular instance when her daughter tried out for cheerleading, but Henderson prayed that her daughter would not make the squad because she knew that she could not afford to pay for it.

Since her termination, Henderson and her family have been supported by the income of her husband, a detective with the Gadsden Police Department, and government assistance in the form of food stamps. Henderson testified that her marriage has suffered tremendously because of the increased pressure placed on her husband, and that she and her husband have been separated on three different occasions.

## II.    Findings

As stated on the record on December 17, 2015, and as summarized below, the court finds in favor of Henderson on her FMLA interference claim and her Title VII and § 1981 race discrimination claim, and in favor of MSE on Henderson's Title VII and § 1981 retaliation claim, as well as her § 1981 gender discrimination claim.

### A.    FMLA Interference Claim

To prove an FMLA interference claim, a plaintiff must show that she was eligible for FMLA leave, that she was entitled to FMLA leave, that she gave the defendant proper notice of her need for FMLA leave, and that the defendant interfered with her rights under the FMLA. *See, e.g., O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1352-54 (11th Cir. 2000); *Sparks v. Sunshine Mills, Inc.*, No. 3:12-CV-02544-IPJ, 2013 WL 4760964, at *14 (N.D. Ala. Sept. 4, 2013).

The court finds that Henderson has proven each of these elements. First, the parties

agreed that Henderson was eligible for FMLA leave. Second, the court finds that Henderson was entitled to FMLA leave because she had a serious medical condition, as reflected in Nurse Practitioner Sammye Bradley's assessment of Henderson's condition. Third, the court finds that Henderson gave proper notice to MSE of her need for leave when she notified Jean Lawson in HR that her doctor had taken her out of work. Henderson's notice was sufficient under 29 C.F.R. § 825.303, which requires employees who must take unforeseeable FMLA leave to "provide notice to the employer as soon as practicable under the facts and circumstances" and to "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request." Finally, the court finds that MSE interfered with Henderson's FMLA rights by terminating her and not allowing her to take FMLA leave.

Accordingly, the court finds in Henderson's favor on her FMLA interference claim.

B.     Title VII and § 1981 Race Discrimination Claims

To prove a claim for race discrimination under Title VII and § 1981, a plaintiff must show that she was terminated or denied a promotion, and that race was a motivating factor in the discharge or denial of the promotion. *See* 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice."); *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245-46 (11th Cir. 2015) (discussing applicable standard in Title VII race discrimination cases); *Standard v. A.B.E.L. Serv., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework.").

The court finds that Henderson has also proven her claim for race discrimination. George

15

Robertson was the person responsible for making the decision to terminate Henderson, and the court finds that race was at least a motivating factor in his decision. Robertson's discriminatory animus is evidenced by the statements he made to Henderson about promoting another black employee; his exclusion of Henderson from production meetings; Taylor Cash's testimony concerning Robertson's derogatory comments about black MSE employees; and Robertson's admission that he referred to another black employee as "JJ," a stereotyped caricature of an African American. The court finds that this evidence constitutes "'a convincing mosaic of circumstantial evidence that . . . allow[s the court] to infer intentional discrimination by the decisionmaker.'" *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).

Consequently, the court finds in Henderson's favor on her race discrimination claim.

C.    <u>Title VII and § 1981 Retaliation Claims</u>

Regarding Henderson's retaliation claims, the court finds that Henderson did not show that MSE understood her complaints to be based on race or gender. Jean Lawson testified that Henderson told her that she was being left out of production meetings; however, Jean Lawson and Mark Weaver both denied that Henderson ever complained to them about race or gender discrimination. Henderson did not offer any other evidence showing that MSE knew she was making complaints based on race or gender discrimination.

Henderson also did not offer evidence sufficient to show that George Robertson, who made the decision to terminate her, was aware that Henderson had complained to Lawson or Weaver. Because Henderson has not established that MSE knew that she was making complaints based on race or gender discrimination, or that Robertson knew that Henderson had complained

to Lawson or Weaver, Henderson has failed to establish the necessary causal link in her retaliation claim. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) ("At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action.") (citations omitted); *see also Brungart v. BellSouth Telcomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him.").

Accordingly, the court finds in MSE's favor on Henderson's retaliation claims.

D.     <u>Title VII Gender Discrimination Claim</u>

Finally, as to Henderson's gender discrimination claim, the court finds that Henderson did not present any evidence showing that an adverse action was taken against her *because of her gender.* Because Henderson did not prove that gender was a motivating factor in her termination, the court finds in MSE's favor on Henderson's gender discrimination claim.

## III.   Damages

After determining at trial that Henderson was entitled to judgment in her favor on her FMLA interference and race discrimination claims, the court concluded that it needed additional briefing from the parties concerning the appropriate measure of damages. Specifically, the court asked the parties to brief the issue of whether Henderson is entitled to back pay only for the period covered by MSE's thirteen week salary continuation policy, or whether she is entitled to back pay from the date of her termination until the time when she applied for disability benefits in November 2013. Having reviewed the parties' briefs, the court FINDS that Henderson should only be awarded back pay for the period that would have been covered by MSE's salary continuation policy.

17

A.      Right to Restoration

As discussed above, the court finds that MSE interfered with Henderson's FMLA rights by terminating her and not allowing her to take medical leave. Henderson is entitled to the pay that she would have received had MSE properly allowed her to take FMLA leave. The FMLA provides for twelve weeks of *unpaid* leave. *See* 29 U.S.C. § 2612. However, MSE has a salary continuation policy that allows employees who are out on medical leave to continue to receive their salary for thirteen weeks. Thus, Henderson is entitled to the pay she would have received pursuant to this policy.

If MSE had not interfered with Henderson's FMLA rights, it would have granted Henderson FMLA leave as of the date of her request, September 7, 2012. At that point, Henderson would have been entitled to thirteen weeks of paid leave pursuant to MSE's salary continuation policy. Henderson received only one week of pay before she was terminated on September 14, 2012. Henderson is entitled to the remaining twelve weeks of pay that she would have received under the salary continuation policy. Henderson's thirteen weeks of paid leave would have expired on December 7, 2012. Therefore, Henderson is entitled to back pay for the period from September 14, 2012 to December 7, 2012.[2]

Henderson contends that she is also entitled to back pay for the period between when her paid leave would have ended and the point when she applied for disability benefits in November

_____

[2] In the updated damages charts emailed to the court post-trial, Henderson improperly calculates that the thirteen week leave period would have ended on December 14, 2012. However, as discussed above, the court finds that if MSE had properly granted Henderson's leave, her salary continuation would have begun on the date of her request for leave. Henderson was paid for one week after her request. Therefore, Henderson is only entitled to an additional *twelve* weeks of back pay, *rather than thirteen*, for the period from September 14, 2012 to December 7, 2012.

18

2013. Whether Henderson is in fact entitled to any additional back pay turns on whether Henderson would have been entitled to be restored to her former position with MSE at the end of her medical leave. The court finds that Henderson would not have been entitled to restoration.

Upon return from FMLA leave, an employee is generally entitled to be restored to the position she held prior to the twelve weeks of FMLA leave, or to an equivalent position. 29 U.S.C. § 2614; 29 C.F.R. § 825.214. An employee is not entitled to restoration, however, if at the end of the FMLA leave period, the employee is unable to perform an essential function of that position. 29 C.F.R. § 825.216(c) ("If the employee is unable to perform an essential function of the position . . . *the employee has no right to restoration to another position under the FMLA.*") (emphasis added); *see also Grace v. Adtran, Inc.*, 470 F. App'x 812, 816 (11th Cir. 2012) (finding that employee who was not able to perform an essential function of her position was not entitled to return to her position at the end of her FMLA leave); *Clark v. Macon Cnty. Greyhound Park, Inc.*, 727 F. Supp. 2d 1282, 1292 (M.D. Ala. 2010) ("An employee has no right to reinstatement under the FMLA if the employee is unable to perform an essential function of her position even when that inability to perform results from the continuation of the serious health condition which brought about an entitlement to FMLA leave in the first place . . . . This is true *even when the employer terminates the employee's employment prior to the end of the twelve-week period of leave.*") (internal citations omitted) (emphasis added).

At trial, Henderson conceded that she was unable to work as of November 1, 2013, when she applied for disability benefits. However, Henderson's health care provider, Nurse Practitioner Sammye Bradley, testified that Henderson would not have been able to return to work at any time between when she excused her from work on September 7, 2012 to the present. Accordingly,

19

MSE contends that Henderson was not able to perform the essential functions of her position and would not have been entitled to restoration at the end of her leave.

Henderson suggests that she could perform the essential functions of her position, and that Bradley's opinion that she could not is of limited probative value because MSE never provided Bradley with a list of the essential functions of Henderson's position.

"An essential function is a 'fundamental job dut[y] of the [plaintiff's] employment position,' as evidenced by the employer's judgment, written job descriptions, the amount of time spent performing the function, and the consequences of allowing the plaintiff not to perform the function." *Grace*, 470 F. App'x at 815-16 (quoting 29 C.F.R. § 1630.2(n)(1), (3)). Henderson's essential duties and responsibilities as set out in the job description for the Molding Supervisor position included the following:

- Supervise and check set-ups, machine operation, initial production and the use of all safety equipment;
- Recommend and implement changes in operating procedures that will help to improve quality, lower costs, and increase productivity;
- Be alert to deterioration of molds as evidenced by abnormal molded parts;
- Diagnose equipment problems and recommend correction action;
- Work closely with manufacturing, engineering, materials, maintenance and quality in fulfilling manufacturing objective.

(Pl.'s Ex. 20, at 756).

Henderson contends that she could perform the essential functions of her position because the listed responsibilities do not include standing, walking, or any other tasks that she had difficulty performing. The court disagrees. Page two of the Molding Supervisor job description provides that "[w]hile performing the duties of this job, the employee is regularly required to

stand. The employee frequently is required to walk, sit, use hands to finger, handle, or feel, reach

with hands and arms, and talk or hear. The employee must frequently lift and/or move up to 50

pounds." (Pl.'s Ex. 20, at 757). Accordingly, the court finds that, based on the physical

requirements set out in the job description, standing and walking were also essential functions of

Henderson's position. Henderson has admitted, and Nurse Practitioner Bradley has confirmed,

that Henderson had trouble with both standing and walking. As such, the court finds that

Henderson was not able to perform the essential functions of her position.

Henderson, however, also suggests that to the extent she could not perform the functions

of her position, MSE could have accommodated her by allowing her to sit down at work more

often. FMLA regulations provide:

> If the employee is unable to perform an essential function of the
> position because of a physical or mental condition, including the
> continuation of a serious health condition or an injury or illness also
> covered by workers' compensation, the employee has no right to
> restoration to another position under the FMLA. The employer's
> obligations *may, however, be governed by the Americans with
> Disabilities Act (ADA)*, as amended.

29 C.F.R. § 825.216(c) (emphasis added).

Henderson, therefore, contends that, upon her return, the ADA would have triggered

MSE's obligations to provide her with a reasonable accommodation.

However, the regulations and case law make clear that the questions of whether an

employee is entitled to restoration under the FMLA and whether an employee is entitled to an

accommodation under the ADA are two *separate and distinct inquiries. See Gilliard v. Ga. Dep't*

*of Corr.,* 500 F. App'x 860, 865 (11th Cir. 2012) ("To the extent that [the plaintiff] argues that

the failure to provide her with extended leave at the conclusion of her FMLA leave denied her a

21

reasonable accommodation, the reasonable-accommodation requirement under the ADA is distinct from an FMLA interference claim."); *Battle v. United Parcel Serv., Inc.*, 438 F.3d 856, 864-65 (8th Cir. 2006) ("[T]he FMLA omits any requirement that employers seek to reasonably accommodate employees who cannot perform the essential functions of their respective positions."); *Tardie v. Rehab. Hosp. of R.I.*, 168 F.3d 538, 544 (1st Cir. 1999) (The FMLA "omits the qualifying 'with or without reasonable accommodation' language. The regulation goes on to state that the employer may have obligations under the ADA, but this reminder does not import the 'reasonable accommodation' qualifier into the FMLA context."); *Bradley v. Army Fleet Support, LLC,* 54 F. Supp. 3d 1272, 1278-79 (M.D. Ala. 2014) (quoting 29 C.F.R. § 825.702(a)) ("The leave provisions of the FMLA are 'wholly distinct from the reasonable accommodation obligations of employers covered under the ADA.'"); *Brown v. Montgomery Surgical Ctr.*, No. 2:12-cv-553-WKW, 2013 WL 1163427, at *4-5 (M.D. Ala. Mar. 20, 2013) (explaining that the Eleventh Circuit, in *Gilliard*, "rejected . . . the employee's attempt to read a reasonable accommodation requirement into the FMLA."). Whether an employer should have provided an employee with a reasonable accommodation under the ADA has no bearing on whether the employer should have reinstated an employee pursuant to the FMLA.

Henderson did not bring an ADA claim against MSE. Therefore, the court is not able to assess whether MSE should have given Henderson a reasonable accommodation at the end of her medical leave. The court is limited to the inquiry of whether MSE should have restored Henderson to her former position at the end of her leave.

The court finds that Henderson would not have been entitled to restoration at the conclusion of her leave. The court finds Nurse Practitioner Sammye Bradley's opinion that

Henderson could not have returned to her job to be credible and convincing. Henderson's self-serving statements that she would have returned to work, against her healthcare provider's advice, are insufficient to counteract the credible testimony of Nurse Practitioner Bradley. *See, e.g., Edgar v. JAC Products, Inc.*, 443 F.3d 501, 514 (6th Cir. 2006) (finding the plaintiff's testimony that she would have returned to work insufficient "to rebut the uncontroverted testimony of her doctors" that she would not have been able to return work).

Although Bradley did not review a list of the essential functions of Henderson's position before forming her opinion, the court finds Bradley's determination that Henderson could not return to work at all sufficient to establish that Henderson could not perform the essential functions of her position. *See Williams v. Toyota Motor Mfg., Ky., Inc.*, 224 F.3d 840, 845 (6th Cir. 2000) (finding that plaintiff who "was placed under a no work of any kind restriction by one of her doctors" was not entitled to reinstatement under the FMLA), *rev'd on other grounds*, 534 U.S. 184 (2002). The court also finds that Bradley's medical opinion and Henderson's own testimony regarding her difficulty standing and walking establish that Henderson could not perform the specific essential functions of standing and walking.

Further, Henderson's medical records do not indicate that her condition improved any following her termination. Henderson argues that the circumstances of her need for medical leave were temporary in nature. Although Henderson did suffer from the temporary ailments of a urinary tract infection, mononucleosis, and shingles, almost seven months after her termination – on May 13, 2013 – Nurse Practitioner Sammye Bradley noted that the severity of Henderson's symptoms was "not improving." (Pl.'s Ex. 31, at 1420). Additionally, at this May 13, 2013 visit, Henderson complained that her "joints [were] still hurting" and that she was "unable to stand any

length of time." (*Id.*). No evidence exists to suggest that Henderson could have performed the essential functions of her position and could have returned to work, except for Henderson's own testimony that she would have returned to work. Henderson's self-serving statements are not enough to allow the court to find in her favor on this issue.

The court further finds that Henderson's testimony that MSE could have accommodated her by allowing her to sit down at work demonstrates that Henderson could not perform the essential functions of her position *without an accommodation*. *See, e.g., Battle,* 438 F.3d at 864-65 ("[T]he FMLA omits any requirement that employers seek to reasonably accommodate employees. . . .")

The court recognizes that MSE bears the burden of showing that Henderson was not entitled to restoration. *See Parris v. Miami Herald Pub. Co.*, 216 F.3d 1298, 1301 n. 1 (explaining that "the employer bears the burden of proving that the employee . . . is not entitled to restoration.") (citing 29 C.F.R. § 825.216(a)). However, the court finds that, with Bradley's medical opinion, Henderson's medical records, and Henderson's testimony regarding the need to sit down occasionally, MSE has satisfied its burden.

Therefore, the court finds that Henderson is not entitled to any additional back pay for the period between December 7, 2012, when her paid leave would have ended, and November 1, 2013, when she applied for disability benefits.

Because Henderson could not perform the functions of her job, she is similarly unable to claim additional back pay under either Title VII or § 1981. *See Lathem v. Dep't of Children & Youth Serv.*, 172 F.3d 786, 794 (11th Cir. 1999) (explaining that in Title VII cases " courts exclude periods where a plaintiff is unavailable to work, such as periods of disability, from the

back pay award."); *Bender v. Salvation Army*, 830 F. Supp. 1454, 1456-57 (M.D. Fla. 1993) ("Plaintiff cannot recoup damages for the period of time that she would have been unable to work due to her injuries.").

      B.     <u>Mitigation of Damages</u>

      Alternatively, the court finds that, even if Henderson were entitled to restoration, she is not entitled to any back pay beyond the twelve weeks of pay she would have received pursuant to the salary continuation policy because she did not adequately mitigate her damages. Under Title VII, Henderson can only recover back pay for the period she was "available and willing to accept substantially equivalent employment elsewhere." *Miller v. Marsh*, 766 F.2d 490, 492 (11th Cir. 1985). A Title VII plaintiff "is required to mitigate damages by being reasonably diligent in seeking employment substantially equivalent to the position she or he lost." *Nord v. U.S. Steel Corp.*, 785 F.2d 1462, 1470 (11th Cir. 1985) (citing *Ford Motor Co. v. EEOC,* 458 U.S. 219 (1982)). The FMLA and § 1981 similarly require plaintiffs to mitigate their damages. *See e.g., Knox v. Cessna Aircraft Co.*, No. 4:05-CV-131(HL), 2007 WL 2874228, at *11 (M.D. Ga. Sept. 26, 2007) ("In FMLA cases, as in other employment discrimination cases, a plaintiff has a duty to reasonably mitigate damages.") (citations omitted).

      The court finds that Henderson did not seek employment that was "substantially equivalent" to her position at MSE. Henderson limited her search to jobs in a supervisor position that allowed her to sit down. Because Henderson's position at MSE was not a sit-down job, the positions that Henderson pursued following her termination were not substantially equivalent to the position she lost at MSE.

      Further, the court finds that Henderson was not "reasonably diligent" in seeking new

employment. Although Henderson testified that she looked for work every week, Henderson could only name three or four places where she had applied for work between September 2012 and November 2013. The court finds that Henderson's efforts were not reasonably diligent.

Accordingly, Henderson did not adequately mitigate her damages, and she is not entitled to any back pay beyond the period covered by MSE's salary continuation policy. The court, therefore, will award Henderson back pay only for the period from September 14, 2012 to December 7, 2012.

> C.   Other Damages

The court will also award Henderson liquidated damages in an amount equal to the amount of her back pay because it finds that MSE *did not* have a reasonable basis for believing that its conduct did not violate the FMLA. *See Cooper v. Fulton Cnty., Ga.*, 458 F.3d 1282, 1287 (11th Cir. 2006) (citing 29 U.S.C. § 2617(a)(1)(A)(iii)) ("Liquidated damages are awarded presumptively to an employee when an employer violates the FMLA, unless the employer demonstrates that its violation was in good faith and that it had a reasonable basis for believing that its conduct was not in violation of the FMLA.").

Additionally, the court will award Henderson $3000 in compensatory damages. The FMLA does not allow recovery for mental distress. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999) (per curiam). However, under Title VII and § 1981, the court may award Henderson compensatory damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). The court finds that $3000 is an appropriate amount to compensate Henderson for the pain and suffering she experienced as a result of MSE's discriminatory conduct.

26

The court will also award Henderson her reasonable attorneys' fees and court costs, upon proof of such amount. *See* 29 U.S.C. § 2617(a)(3) (allowing recovery of attorneys' fees and costs in FMLA case); 42 U.S.C. § 2000e-5(k) (allowing recovery of attorneys' fees in Title VII case).

The court finds that an award of punitive damages is not warranted in this case because Henderson did not demonstrate that MSE "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [her] federally protected rights . . . ." 42 U.S.C. § 1981a(b)(1).

**IV.    Conclusion**

For the reasons stated on the record on December 17, 2015 and the reasons set out in this Opinion, the court finds in Henderson's favor on her FMLA interference and race discrimination claims. The court finds in MSE's favor on Henderson's retaliation and gender discrimination claims.

As to damages, the court finds that Henderson is entitled to back pay only for the period covered by MSE's salary continuation policy. Because the parties did not provide the court with a back pay damages chart covering the appropriate time period, the court ORDERS the parties to jointly submit by Wednesday, June 8, 2016 an updated damages chart, setting out the amount of back pay to which Henderson is entitled for the period from September 14, 2012 to December 7, 2012, and including interest compounded daily to the date of submission.

Upon receipt of this chart, the court will award Henderson back pay for this period, plus interest, and an equal amount in liquidated damages, as well as $3000 in compensatory damages. The court will also award Henderson her reasonable attorneys' fees and court costs, upon proof of such amount, to be submitted by June 8, 2016.

27

The court will enter a separate Order along with this Opinion.

DONE and ORDERED this 1st day of June, 2016.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE